## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

3M COMPANY,

      Plaintiff,

                                       Case No.: 6:20-cv-00648

v.

GEFTICO, LLC,

      Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

Defendant, Geftico, LLC ("Geftico" or "Defendant"), by and through its undersigned counsel, and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 3.01(a), hereby moves this Court to dismiss Plaintiff's, 3M Company ("Plaintiff" or "3M"), Complaint and Demand for Jury Trial (the "Complaint") (Dkt. 1), and in support thereof, states:

## INTRODUCTION

1.     3M's Complaint is short on ultimate facts and long on inflammatory, derogatory, and conclusory assertions. Upon a careful review of the Complaint, there are a few tell-tale signs that it was drafted and filed in haste without paying careful attention to the contents of the Exhibits attached to the Complaint, including allegations that Geftico sent a "smoking gun" email (Exhibit L) even though, as reflected on the face of the email, Geftico did not send it. Additionally, there are other allegations of Geftico's purported conduct that do not measure up to what the Exhibits actually show. One reasonable explanation for this is

that 3M was in a hurry to file this lawsuit (as well as others in different federal jurisdictions)[1] against anyone in order to distract the media's attention and take the heat off of itself for, *inter alia*, the debacle of selling U.S.-manufactured respirators to Canada and Latin America rather than to the United States.[2] In any event, for the reasons more fully set forth below, 3M's Complaint must be dismissed for failure to state a claim upon which relief can be granted.

## BACKGROUND

2.     On April 14, 2020, Plaintiff filed its Complaint against Defendant, asserting seven (7) causes of action: (a) Count I, trademark infringement under 15 U.S.C. § 1114(1); (b) Count II, unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A); (c) Count III, trademark dilution under 15 U.S.C. § 1125(c); (d) Count IV, false advertising under 15 U.S.C. § 1125(a)(1)(B); (e) Count V, violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201, *et seq.*, Fla. Stat. ("FDUTPA"); (f) Count VI, dilution under section 495.151, Fla. Stat.; (g) Count VII, trademark infringement under section 495.131, Fla. Stat.; and (h) Count VIII, unfair competition under Florida common law. (Dkt. 1, the "Compl.").

---

[1] There are at least two other federal cases that 3M filed around the same time as the instant action: (a) 3M Company v. RX2LIVE, LLC, Case No. 1:20-cv-00523-NONE-SAB (U.S. Dist. Ct., E.D. Ca. 4/19/20); and (b) 3M Company v. Performance Supply, LLC, 1:20-cv-02949-LAP (U.S. Dist. Ct., S.D.N.Y 4/13/20). Notably, these Complaints contain a lot of the same cookie-cutter allegations that appear in the Complaint in the instant case.

[2] David DiSalvo, Senior Contributor for Healthcare, Forbes, "N95 Masks Have Been Leaving the Country During the Coronavirus Pandemic When We Needed Them Most – What Should Happen Next?", https://www.forbes.com/sites/daviddisalvo/2020/04/06/n95-masks-have-been-leaving-the-country-during-the-coronavirus-pandemic-when-we-needed-them-the-most-what-should-happen-next/#afff6ad41e0e; Parija Kavilanz, CNN Business, "3M: We'll make more N95 masks for the US but we need to keep exporting them", https://www.cnn.com/2020/04/03/business/3m-defense-production-act-response/index.html.

3. All of these claims are premised upon the same core nucleus of facts, which largely consist of inflammatory, derogatory, and conclusory assertions and which are allegedly supported by exhibits. Upon a close examination of the allegations of the Complaint and the attached Exhibits, and after the elimination of all of the self-congratulatory fluff and sound bites to placate the media, 3M's case crumbles like a cookie.

4. Throughout the history of the company, 3M has provided scientific and medical products to consumers worldwide under its 3M marks and consumers rely on those marks to identify "superior quality" 3M products. (Compl. 1, ¶ 3). 3M has federal trademark registrations that cover its symbol "3M" and its slogan "3M Science. Applied to Life." (Id., ¶ 28).

5. The demand for 3M respirators has grown "exponentially" in response to the COVID-19 pandemic. (Id., ¶ 5). Supposedly, "3M has not increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak" (Id., and ¶ 36), though assuredly 3M's list price still makes it a profit. Because 3M's N95 masks and other products are in high demand, 3M claims that scams have been created regarding these products, including price gouging, fake offers, and counterfeiting. (Id., ¶ 6).

6. On or about March 31, 2020, Geftico sent a PowerPoint presentation titled "masks" (hereafter, the "Presentation") to Adam Lorimer of the CDC's Office of the Assistant Secretary of Preparedness and Response, COVID-19 Response Detail with the DSNS. (Id., 40, and Composite Exhibit H). In the Presentation, 3M alleges that Geftico offered to sell to DNSN 15 million 3M-brand, N95 Model 1860 respirators for $6.77 each. (Id., ¶ 41, and Composite Exhibit H).

7. Regarding the Presentation, 3M alleges that: "[t]he Presentation contains a Technical Data Sheet for the 3M-brand, N95 Model 1860 respirators that Defendant purportedly had for sale" (Id., ¶ 42, and Composite Exhibit H); "Plaintiff's famous 3M design mark, and well-known slogan, '3M Science. Applied to Life,' prominently appeared in the upper left-hand corner of the Technical Data Sheet" (Id., ¶ 42, and Composite Exhibit H); "Plaintiff's famous 3M design mark also appeared in the bottom of the Technical Data Sheet" (Id., ¶ 42, and Composite Exhibit H); and "[a]dditionally, Plaintiff's famous standard-character 3M mark appeared in the Technical Specification Sheets" (Id., ¶ 41, and Composite Exhibit H).

8. 3M further alleges that: "Defendant's use of the 3M Marks throughout the Presentation was intended to mislead the CDC and DSNS into believing that Defendant was an authorized distributor of Plaintiff's products and/or otherwise had an association or affiliation with Plaintiff and its products. Defendant is not, and never has been, an authorized distributor or vendor of Plaintiff's products. Defendant also does not have, and has never had, an association or affiliation with Plaintiff." (Id., ¶ 43, and Composite Exhibit H).

9. Composite Exhibit H, however, does not say what 3M claims it says. On the first page of the Exhibit, there is an email to which the Presentation is attached. Admittedly, Geftico sent the email and the Presentation to Mr. Lorimer as indicated by the Exhibit, but 3M (either negligently, conveniently or purposefully) ignored the subject line and the body of the email. The subject line clearly reads "Mike Geftic – **Offerings from Companies Represented by Geftico**." (emphasis added). The body of the email states, in its entirety:

Nice speaking with you **earlier attached is a presentation from the companies that have in stock or have on order for Hand Sanitizer, Masks Etc**.

Please let me know if there is any questions on any individual items I have on here and **I can get a call or email communication going with the individual companies who own the items directly**.

As well I did get an offering on 3M masks this AM, I believe the price is very High and **not sure how many hands have touched them**, but there are 15 Million in Texas right now that can be bought.

Please let me know if you need any more info, my cell…is the best place to get with me.

(Compl., Composite Exhibit H, p. 2) (emphasis added). Based on this email, Geftico **did not** have the respirators for sale, **never** stated that it had a relationship with 3M, and **informed** Mr. Lorimer that the PPE contained in the Presentation was for products being sold by others, i.e., the email clearly refers to "**companies represented by Geftico**" and "the companies that have in stock." (Id.). The email also states that Geftico can get "a call or email communication going with **the individual companies who own the items directly**." (Id.). Thus, this email clearly shows that Geftico was an independent sales company that was merely passing information about products that were being sold by and in the possession of other companies; no other reasonable inference can be obtained from the contents of this email, thereby making Composite Exhibit H directly contradictory to 3M's fanciful allegations.

10. Additionally, the Presentation that is attached to the email references other PPE products, not just 3M-manufactured ones, being sold by companies/vendors represented by Geftico. (Compl., Composite Exh. H). In fact, 3M masks only appear on one page of the

Presentation which is an informational promotional marketing pamphlet made by 3M! (Id., p. 6).[3]

11.     3M also accuses Defendant of price gouging because the $6.77 per mask sale price was higher than 3M's suggested retail price of $1.27. (Compl., ¶ 45). Again, as the email plainly states, the products are sold by other companies at those prices, not Geftico. This is another instance of a 3M allegation being negated by the attached Exhibits.

12.     After the March 31, 2020 email, the next email communication between Mr. Lorimer and Geftico occurred on April 7, 2020, as part of the email chain from Composite Exhibit H and bearing the subject line of "**Mike Geftic – Offerings from companies represented by Geftico**". (Compl., Exh. I, p. 2) (emphasis added). It references new availability on 3M N95 model number 1860 masks, including location, units, and price, and requests that Mr. Lorimer let Geftico know "if you need any additional information or have any questions." (Id.). In response to this email, Mr. Lorimer requested that Geftico provide the lot numbers for the 3M respirators. (Id., Exhibit J). Geftico respond to this email by stating "OK no problem, **I will ask my vendor for this information**." (Id., Exhibit K) (emphasis added).

13.     3M next alleges that, on April 8, 2020, "instead of providing the requested information, [Geftico] responded with more false information contained in an email and an attached Letter of Intent". (Id., ¶ 51, and Exhibit L). However, when you look at Exhibit L, Geftico never provided any information, much less false information, to Mr. Lorimer. The

---

[3] Notably, this is no different than Walmart selling trademarked products that it purchased from manufacturers by advertising such products on its website using marketing materials and pictures created by the manufacturer.

email in Exhibit L is from Chris, not Mike Geftic, and was sent from the email address chris@progadsales.com, not mike@geftico.com. (<u>Id.</u>, Exhibit L). In fact, Mike Geftic (mike@geftico.com) was even carbon-copied on the email. (<u>Id.</u>). The information contained in this email and the attached Letter of Intent, therefore, **<u>did not</u>** come from Geftico. Consequently, Geftico is not responsible for the information contained in the chris@progadsales.com email, regardless of its truth or falsity.

14.     Based on the above allegations and the Exhibits to the Complaint, 3M "seeks relief against Defendant for federal and state trademark infringement, unfair competition, false, association, false endorsement, false designation of origin, trademark dilution, false advertising, and deceptive acts and business practices." (<u>Id.</u>, ¶ 55).

## MOTION TO DISMISS STANDARD

15.     When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept the allegations of the non-movant's pleadings as true, but "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Moreover, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). The Eleventh Circuit has made it clear that when a plaintiff attaches exhibits to a complaint and the exhibits contradict the allegations of the complaint, the exhibits control. <u>See</u> <u>Griffin Indus., Inc. v. Irvin</u>, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations. **Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern**.

Id. (emphasis added); see also Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control."); Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974).[4] In Associated Builders, the Court recognized that "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint." Associated Builders, 505 F.2d at 100. "If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed.R.Civ.P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." Id.

## MEMORANDUM OF LAW

### A. Count I fails to state a claim for trademark infringement under 15 U.S.C. § 1114(1).

16.     In Count I of the Complaint, 3M alleges trademark infringement in violation of 15 U.S.C. § 1114(1). Specifically, 3M faults Geftico for "using the 3M Marks in commerce to advertise, promote, offer for sale, and sell 3M-brand N95 respirators, including, for example, in the 'letter of intent'". (Compl., ¶ 63). 3M further alleges that Geftico's use of its 3M Marks "is causing, likely to cause and is likely to continue causing, consumer confusion, mistake, and/or deception about whether": (a) Geftico is 3M; (b) Geftico is an affiliate, licensee, or

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

authorized distributor of 3M; (c) Geftico's products are affiliated, connected, or associated with 3M's products; and (d) Geftico or Geftico's products originate with, sponsored or approved by, or are offered under a license from 3M (Id., ¶¶ 64-66). Section 1114(1) provides, in pertinent part:

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

It is well-settled that under the "first sale doctrine," an independent dealer may use a manufacturer's trademark to re-sell that brand of goods, see, e.g., Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1077 (9th Cir. 1995); Quill Corp. v. NADA Scientific Ltd., Case No. 97 C 7461, 1998 U.S. Dist. LEXIS 8527, 1998 WL 295502 (N.D. Ill. 1998), and that such conduct does not constitute trademark infringement or unfair competition. However, "one who resells trademark goods is obligated to do so in a manner that is not likely to cause confusion or imply that the seller is associated with the manufacturer." Quill, 1998 U.S. Dist. LEXIS 8527, at *8.

17.     Here, 3M has failed to allege ultimate facts to establish that Geftico was using 3M marks in an infringing manner.  First, there is nothing about the emails attached in Exhibits H, K, and L or the Presentation included as part of Exhibit H (i.e., the documents on which 3M relies to state a claim for infringement) that would cause confusion that Geftico is 3M.  In fact, the subject line of the emails stated that "Offerings from Companies Represented by GEFTICO", and the emails in Exhibit H and J make it clear that the PPE items for sale were from other vendors, not 3M.  There is no representation of any kind that Geftico is 3M or that Geftico is an affiliate/licensee/authorized distributor of 3M.  Second, nowhere in the Exhibits does Geftico state that it has any products, much less ones that are affiliated, associated, or originate with or approved by 3M, in Geftico's possession for sale.  Rather, Geftico made it crystal clear that the products being sold were in the hands of other vendors that Geftico represented.  Third, as the emails clearly reflect, Geftico's name, branding, location, phone number, and email address in no way indicate any affiliation with 3M that would cause confusion between Geftico and 3M.  Because the Exhibits to the Complaint govern, and because they negate 3M's allegations, 3M has failed to allege actionable trademark infringement against Geftico.  See Simmons, 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").

18.     Additionally, 3M's trademark infringement claim fails under the "first sale" doctrine".  As explained by the Quill court, in Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 911 (Fed. Cir. 1984), and Stormor, a Div. of Fuqua Inds., Inc. v. Johnson, 587 F. Supp. 275, 279 (W.D. Mich. 1984), cases in which the courts found that resellers had

engaged in trademark infringement, "the reseller's conduct went beyond the mere resale of trademark goods. In each case, the manufacturer had an authorized sales network in place, and the defendant's actions mislead consumers into believing that the defendant was part of that network." Quill, 1998 U.S. Dist. LEXIS 8527, at *8. Here, 3M has alleged (including through the attached Exhibits) that Geftico was reselling 3M-branded masks. There is no allegation of any conduct by Geftico that it was part of any authorized sales network of 3M, and the Exhibits to the Complaint clearly show that Geftico never held itself out as an authorized dealer or licensee of 3M. As a result, Count I fails to state a claim and must be dismissed.

**B.**     **Count II fails to state claim for unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).**

    19.     In Count II of the Complaint, 3M alleges unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A). Notably, 3M's allegations in this Count are quite flimsy, alleging the elements of the claim "upon information and belief" and following that up in one instance with the conclusory statement of "Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A)" with no detail or elaboration. (Compl., ¶ 76). This harkens back to the days of notice pleading, which was rejected by the United States Supreme Court in Twombly and Iqbal. In any event, under this Count, 3M also alleges that: (a) "**[u]pon information and belief**, Defendant's use of Plaintiff's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A)" (Id., ¶ 77) (emphasis added); and (b)

"Defendant has also falsely held itself and its affiliates out to be an agent of and/or authorized by Plaintiff to sell and/or distribute 3M-branded products, when this is not the case" (Id., ¶ 78).

20.     Section 1125(a)(1)(A) provides as follows:

(a)  Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
        (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or…

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The "first sale" doctrine also applies to claims under section 1125(a).  See, e.g., Brain Pharma, LLC v. Scalini, 858 F. Supp. 2d 1349, 1353 (S.D. Fla. 2012).  "Under the 'first sale doctrine,' the resale of genuine trademarked goods does not generally constitute trademark infringement."  Id. (citing Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1301 (11th Cir. 2001)).  "Thus, even if a subsequent sale of a trademarked good is made without the trademark owner's consent, the resale of a genuine good does not violate the Lanham Act." Id. (citing Davidoff, 263 F. 3d at 1302).  "However, the first sale doctrine does not apply 'when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner.'"  Id.  "A material difference is a difference that consumers consider relevant to a decision about whether to purchase a product."  Id.  "The Eleventh Circuit has held that the resale of a trademarked product that has been altered, resulting in physical differences in the product, is a material difference that can create a likelihood of consumer confusion."  Id.

(citing <u>Davidoff</u>, 263 F. 3d at 1302, which affirmed district court's finding that etching glass of perfume bottle to remove the batch code degraded appearance of product and created likelihood of confusion)).

21.     Based on the Exhibits attached to the Complaint, Geftico did not sell any trademarked goods to anyone.  Geftico's vendors had 3M branded masks for sale, not Geftico, and Geftico merely passed along that information to a potential buyer, eventually putting the potential buyer directly into contact with another (who, not Geftico, sent the purported "smoking gun" email in Exhibit L to Mr. Lorimer).  At best, based on the governing Exhibits, Geftico made a sales pitch for its vendors who "have in stock or have an order for" masks, including 3M branded ones.  This language, even when viewed in a light most favorable to 3M, means that Geftico's vendors are engaging in a resale a 3M-branded products, an activity which is not prohibited by the Lanham Act.  Moreover, there are no allegations (at least none which are not contradicted by the attached Exhibits) that the 3M-branded masks for sale by Geftico's vendors have been altered in any way causing a material difference that would otherwise make the resale actionable.  As a result, 3M has failed to state a claim against Geftico under section 1125(a)(1)(A).

22.     Additionally, neither the Lanham Act nor Florida law provides a plaintiff with a civil claim for price gouging.  <u>See</u> <u>Harold H. Huggins Realty, Inc. v. FNC, Inc.</u>, 634 F.3d 787, 798 (5th Cir. 2011) ("[C]onsumers do not have standing under the Lanham Act [because] the injuries consumers suffer as a result of anti-competitive behavior — being forced to pay a higher price for a good, or being duped into purchasing a lower-quality service — are not the kinds of injuries that the Lanham Act was intended to redress."); <u>Equity Lifestyle Props., Inc.</u>

v. Fla. Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1241 and n.10 (11th Cir. 2009); Fla. Stat. § 501.160(8) (2019) (unconscionable prices of commodities during declared state of emergency is enforced by office of state attorney or Department of Legal Affairs). Therefore, working the phrase "price gouging" into Count II does not magically revive this otherwise failed claim; but rather, it only serves to spuriously try to impassion the reader. As a result, Count II must be dismissed for failure to state a claim upon which relief can be granted.

C.    **Counts III and VI fail to state a claim for federal and state trademark dilution, respectively.**

23.    In Count III of the Complaint, 3M asserts a claim for trademark dilution under 15 U.S.C. § 1125(c), and in Count VI, 3M asserts a claim for trademark dilution under section 495.151, Fla. Stat. Notably, both claims contain virtually the same allegations. 3M alleges that its marks "were famous among the general consuming public before and at the time Geftico began using 3M's marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators)." (Compl., ¶¶ 83, 110). 3M goes on to allege that "Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that": (a) the established selling power and the value of the marks will be whittled away; (b) the ability to identify 3M as the source of the 3M marks will be whittled away; (c) the marks' indication of superior quality will be whittled away; and (b) 3M's exclusive association with the marks will be blurred. (Id., ¶¶ 84-87, and 111-112).

24.     Courts have found that the standard for establishing a dilution claim under Florida law is essentially the same as that of a dilution claim under the Lanham Act.  <u>Florida Int'l Univ. Board of Trustees v. Fla. Nat'l Univ., Inc.</u>, 91 F.Supp.3d 1265, 1286 (S.D. Fla. 2015) (citations omitted).  "To prevail on a dilution claim, the plaintiff must show that: (1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the mark has likely caused dilution." <u>Id.</u> (citing <u>Rain Bird Corp. v. Taylor</u>, 65 F.Supp.2d 1258, 1266-67 (N.D. Fla. 2009)).

25.     "Dilution by blurring" occurs when defendant's mark "'impermissibly creates an association' arising from the similarity between its mark and [the plaintiff's] marks, thus diluting the distinctiveness of [the plaintiff's] marks." <u>Id.</u> "In determining whether a mark is likely to cause dilution by blurring, the Court may consider all relevant factors, including the following: (i) the degree of similarity between the mark and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark intended to create an association with the famous mark; and (vi) any actual association between the mark and the famous mark." <u>Id.</u>  For example, in the <u>Florida Int'l Univ. Board of Trustees</u> case, the court examined whether Florida National University's marks were similar to Florida International University's marks using these factors, concluding that there was no serious danger that the consuming public would think that both parties marks originate from a single source.  <u>Id.</u>, at 1287-88.

26.     In the instant case, based on the Exhibits to the Complaint, Geftico's vendors were engaging in the resale of 3M-branded masks.  There are no facts alleged that show 3M's marks were diluted in any way by the mere reselling of 3M's own products.  To the contrary, the reselling of 3M's own products would have zero negative impact on the quality, identity, selling power, and value of the marks.  Unlike the <u>Rain Bird</u> and <u>Florida Int'l Univ. Board of Trustees</u> cases, this is not a situation where a defendant used or was accused of using similar marks to sell goods and services to consumers who would be unable to differentiate between 3M and Geftico.   In fact, as analyzed above, Geftico's written communications attached as Exhibits to the Complaint carefully let the recipient and any other reader know that 3M products are being sold by vendors that Geftico represents.  No confusion could possibly or reasonably arise under those circumstances, especially considering that Geftico does not use a name, symbol, email address, or contact information similar to 3M and does not say that it is affiliated with, an authorized dealer of, or licensee of 3M.  Based on these facts, 3M's position is essentially akin to saying that an E-Bay seller offering to sell Nike Air Jordan sneakers (even above original list price) dilutes Nike's marks by such resale.  On its face, such a position is patently absurd and would actually be injurious to commerce.  Additionally, to the extent that this claim is premised upon alleged price gouging, such a claim is not cognizable under the Lanham Act or Florida law.  <u>See</u> <u>Harold H. Huggins Realty</u>, 634 F.3d at 798; <u>Equity Lifestyle Props., Inc.</u>, 556 F.3d at 1241 and n.10; Fla. Stat. § 501.160(8) (2019).  As a result, Counts III and VI fail to state a claim upon which relief can be granted and must, accordingly, be dismissed.

**D.** **Count IV fails to state a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B).**

27.     In Count IV of the Complaint, 3M asserts a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B), dubbed "Defendant's 'Letter of Intent'". In this Count, 3M alleges that "[t]he statements that Defendant made in its Letter of Intent constitute commercial advertising and/or commercial promotion" and "contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendant and/or the products that Defendant allegedly had available for sale." (Compl., ¶¶ 93-94). 3M also alleges that the Letter of Intent contained "false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Plaintiff and Plaintiff's 3M-brand products, including, without limitation, Plaintiff's 3M-brand N95 respirators." (Id., ¶ 95). According to 3M, the Letter of Intent is likely to cause 3M "to suffer harm in the form of lost sales and irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and goodwill." (Id., ¶ 97).

28.     "To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, [i.e., 15 U.S.C. § 1125(a)(1)(B),] a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been -- or is likely to be -- injured as a result of the false advertising." Hickson Corp. v. Northern Crossarm Co., 357 F.3d 1256, 1260-61 (11th Cir. 2004). Thus, in the first element, a necessary showing is that the defendant initiated the alleged false advertising.

29. 3M's allegations in Count IV suffer from a colossal flaw that obliterates this entire claim. As established by Exhibit L, which is the email that transmitted the Letter of Intent to Mr. Lorimer, neither Geftico nor its President, Mike Geftic, sent the email and its attached Letter of Intent to Mr. Lorimer. Instead, the email and Letter of Intent were sent to Mr. Lorimer by Chris from the email address christopher@progadsales.com, not from Geftico or mike@geftico.com. Because Exhibit L controls here and negates 3M's allegations, 3M cannot prevail on a false advertising claim where Geftico did not send the alleged false advertisement. As a result, Count IV fails to state a claim against Geftico. Because 3M can never state a claim for false advertisement against Geftico based on Exhibit L, this Court should dismiss Count IV with prejudice.

**E.     Count V fails to state a claim for a violation of FDUPTA.**

30. In Count V of the Complaint, 3M asserts a claim against Geftico for a FDUTPA violation. In support of this claim, 3M alleges that: (a) Geftico used 3M's marks without authorization; (b) Geftico used 3M's marks in the Presentation with "the intent of confusing and misleading consumers, including the CDC and DSNS, that Defendant is an authorized distributor of 3M products, and that Defendant had genuine 3M-brand products for sale"; and (c) Geftico attempted to "exploit a global pandemic for profit". Basically, this claim is another iteration of 3M's trademark infringement claim.

31. In order to be entitled to relief under Sections 501.211(1) and 501.211(2), Fla. Stat., 3M must allege that it was aggrieved by an act or practice that constitutes a "violation of this part." See Fla. Stat. § 501.211(1) (2019). While engaging in trademark infringement can be an unfair and deceptive trade practice that constitutes a "violation of this part", see

<u>Laboratorios Roldan v. Tex Int'l, Inc.</u>, 902 F.Supp. 1555, 1569-70 (S.D. Fla. 1995) (explaining that intentionally palming off or passing off products is the type of behavior which FDUTPA was meant to protect against), 3M has to actually allege a claim for trademark infringement. <u>See</u> <u>Wedding & Event Videographers Ass'n v. Videooccasion, Inc.</u>, Case No. 8:05-cv-923-T-23TGW, 2005 U.S. Dist. LEXIS 58373, *6 n.4 (M.D. Fla. July 29, 2005) (recognizing that plaintiff's claim for FDUPTA violation was same as federal trademark infringement claim and, therefore, "the elements for establishing both of the claims are the same.") (citing <u>Investacorp, Inc. v. Arabian Inv. Banking Corp.</u>, 931 F.2d 1519, 1521 (11th Cir. 1991)). As analyzed above, and as demonstrated by the Exhibits to the Complaint, 3M has failed to allege that Geftico has engaged in trademark infringement. Consequently, by extension, 3M has also failed to allege a violation of FDUTPA based on the same purported conduct. Accordingly, Count V should be dismissed.

**F.      Count VII fails to state a claim for trademark infringement under section 495.131, Florida Statutes.**

32.      In Count VII of the Complaint, 3M asserts a claim for trademark infringement under section 495.131, Fla. Stat. Similar to the Lanham Act trademark infringement claim asserted in Count I, 3M alleges (mostly in a conclusory fashion) that: (a) 3M is the exclusive owner of 3M's marks and slogan; (b) 3M did not authorize Geftico to use 3M's marks or slogans to promote or sell 3M products, including in the Presentation; (c) Geftico used 3M marks in furtherance of a scheme to exploit consumer goodwill, reputation, fame, and commercial success of 3M's products; (d) 3M has suffered and will suffer from Geftico's actions and complained-of conduct, including advertising and offering to sell products for "exorbitant prices", i.e., price gouging. (Compl., ¶¶ 117-124).

33.     Section 495.131, Fla. Stat., provides, in pertinent part:

[A]ny person who shall, without the consent of the registrant:

(1)   Use any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, to cause mistake, or to deceive; or

(2)   Reproduce, counterfeit, copy, or colorably imitate a mark registered under this chapter and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, to cause mistake, or to deceive;

shall be liable in a civil action by the owner of such registered mark….

According to the Florida Supreme Court, federal case law interpreting federal trademark law is to be given "due consideration and great weight" when interpreting Florida's trademark laws.  Great S. Bank v. First S. Bank, 625 So.2d 463, 466-67 n.4 (Fla. 1993); M&B Beverage Corp. v. N.Y.N.Y. Hotel, LLC, Case No. 96-2481-CIV-Moreno, 1997 U.S. Dist. LEXIS 24258, * 39 (S.D. Fla. Oct. 22, 1997).  Thus, "[i]In essence, claims for trademark infringement arising under Florida law are to be analyzed pursuant to federal jurisprudence."   M&B Beverage Corp., 1997 U.S. Dist. LEXIS 24258, at *39.

34.     For the reasons set forth above under subsection A. of this Memorandum of Law, including but not limited to: (a) the Exhibits attached to the Complaint negate 3M's allegations; (b) the Exhibits show that no confusion or mistake was possible; and (c) the first sale doctrine, 3M fails to state a claim for trademark infringement.  See, e.g., M&B Beverage Corp., 1997 U.S. Dist. LEXIS 24258, at *39 (concluding that "in light of this Court's finding that the Hotel's federal marks do not infringe upon M&B's federal registrations, this Court

finds that M&B's claim for trademark infringement under Florida law must also fail."). Consequently, by extension, Count VII fails to state a claim upon which relief can be granted and must, accordingly, be dismissed.

**G.** **Count VIII fails to state a claim for unfair competition under Florida common law.**

35.    In Count VIII of the Complaint, 3M asserts a claim against Geftico for unfair competition under Florida common law.  In this Count, 3M alleges that: (a) 3M has the exclusive right to its marks and its slogan for advertising, offering to sell, and selling its products, including its respirators; and (b) "Defendant's use of the 3M Marks and 3M Slogan in commerce for, among other things, advertising, promoting, offering for sale, and selling Plaintiff's 3M-brand products, including N95 respirators is likely to confuse consumers, including government agencies, and mislead them into believing that Defendant is associated with Plaintiff, is an authorized distributor for Plaintiff, and/or has available for sale genuine 3M-brand products".  (Compl., ¶¶ 127-128).

36.    Under Florida common law, unfair competition is an "'umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'"  Sony Corp. Digital4Less, Inc., Case No. 6:12-cv-1893-Orl-28-GJK, 2013 U.S. Dist. LEXIS 180717, *12 (M.D. Fla. Dec. 3, 2013) (quoting Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1325 (M.D. Fla. 2007)).  "For example, a party may claim unfair competition under a variety of theories, including trademark infringement, Monsanto Co. v. Campuzano, 206 F.Supp.2d 1252, 1267 (S.D. Fla. 2002)".  Id.  "As such, there is no single set of 'elements that apply uniformly to all claims of unfair competition[.]'"  Id., at *13 (quoting Alphamed Pharm. Corp. v. Arriva Pharm.,

Inc., 432 F.Supp.2d 1319, 1353 (S.D. Fla. 2006)). "Accordingly, courts have applied elements from other established claims to unfair competition claims, where appropriate, on a case-by-case basis." Id. (citing examples, including: Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) (using elements of federal trademark infringement claim to evaluate sufficiency of unfair competition claim based on trademark infringement); Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1521 (11th Cir. 1991) (same)).

37.     Here, 3M's allegations mirror those in its trademark infringement claim under Count I.  For the reasons set forth above under subsection A. of this Memorandum of Law, including but not limited to: (a) the Exhibits attached to the Complaint negate 3M's allegations; (b) the Exhibits show that no confusion or mistake was possible; and (c) the first sale doctrine, 3M fails to state a claim for common law unfair competition.  See generally, M&B Beverage Corp., 1997 U.S. Dist. LEXIS 24258, at *39 (concluding that "in light of this Court's finding that the Hotel's federal marks do not infringe upon M&B's federal registrations, this Court finds that M&B's claim for trademark infringement under Florida law must also fail."). Consequently, Count VIII fails to state a claim upon which relief can be granted and must be dismissed.

**WHEREFORE,** Geftico respectfully requests that this Court enter an Order: (a) granting the instant Motion; (b) dismissing all claims in 3M's Complaint for failure to state a claim, including Count IV with prejudice; and (c) award Geftico such other relief that this Court deems just and equitable.

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2020, I electronically filed the foregoing with the Clerk of Court by using CM/ECF system which will send a notice of electronic filing to Plaintiff's Florida counsel, Joseph M. Wasserkrug,, Esq., and on Plaintiff's Illinois counsel, Michael W. Weaver, Esq. (mweaver@mwe.com).

*/s/ Brandon W. Banks*
Brandon W. Banks, Esq.
Florida Bar No.: 587461
Brian M. Walsh, Esq.
Florida Bar No.: 10968
**WALSH BANKS LAW**
P.O. Box 2271
Orlando, FL 32802
Ph: (407) 259-2426; Fx: (407) 391-3626
Email: brandon.banks@walshbanks.com
Email: brian.walsh@walshbanks.com
Email: hal.morlan@walshbanks.com
Secondary Email: service@walshbanks.com